**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**
Danville Division

| | | |
|---|---|---|
| **RICHARD M. BARTS,** | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13-cv-00023 |
| v. | ) | |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | By:     Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff Richard M. Barts asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision terminating his disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. Barts argues that the Appeals

Council misapplied the law when it refused to consider additional evidence (Pl. Br. 5–9), and

that the Administrative Law Judge's ("ALJ") decision to terminate his benefits should be

reversed based on that evidence (Pl. Br. 9–10). He urges the Court to reverse the Commissioner's

decision and to reinstate benefits, or to remand his case for the ALJ to consider the additional

evidence. (Pl. Br. 11.) This Court has authority to decide Barts's case under 42 U.S.C. § 405(g),

and his case is before me by referral under 28 U.S.C. § 636(b)(1)(B) (ECF No. 18).

After reviewing the administrative record, the parties' briefs, and the applicable law, I

find that the Commissioner's decision is supported by substantial evidence. Therefore, I

recommend that the Court **DENY** Barts's Motion for Summary Judgment or for Remand (ECF

No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 16), **AFFIRM**

---

[1] Carolyn W. Colvin became Acting Commissioner of the Social Security Administration on February 14, 2013. Colvin is substituted for Michael J. Astrue as the defendant in this action. *See* Fed. R. Civ. P. 25(d).

the Commissioner's final decision terminating Barts's benefits, and **DISMISS** this case from the Court's active docket.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision terminating a person's disability benefits. *See* 42 U.S.C. § 405(g); *Guiton v. Colvin*, 546 Fed. App'x 137, 140 (4th Cir. 2013). The Court's role, however, is limited—it may not reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of agency officials. *See Guiton*, 546 Fed. App'x at 140–41 (citing *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012)). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Id.* at 140.

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). A disabled person generally is entitled to benefits until he or she dies, reaches retirement age, or is no longer disabled. 20 C.F.R. § 404.316(b)(1)–(3). To determine if a person remains disabled, the Commissioner asks, in order, whether the person: (1) is working; (2) has an impairment that meets or equals an impairment listed in the Act's regulations; (3) has experienced a "medical improvement" in the disabling impairment; (4) has experienced an improvement in his or her ability to work; (5) meets any "exceptions to medical improvement," if applicable; (6) still has a severe impairment; (7) can return to his or her past relevant work; and, if not (8) can do other work that exists in the national economy. 20 C.F.R. § 404.1594(f)(1)–(8); *see also Mullins v. Astrue*, No. 2:08-cv-4, 2008 WL 4642988 (W.D. Va. Oct. 21, 2008).

The fact that a person was once "disabled" does not give rise to a presumption that he or she remains disabled. 42 U.S.C. § 423(f). However, the Commissioner bears the burden of "show[ing] that a medical improvement has occurred and that the improvement relates to the claimant's ability to work." *Edwards v. Astrue*, 4:12-cv-5, 2012 WL 6082898, at *3 (W.D. Va. Dec. 6, 2012) (Kiser, J.) (citing *Lively v. Bowen*, 858 F.2d 177, 181 n.2 (4th Cir. 1988)). A person's disability "ends" when he or she is again "able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1)(B). If the claimant produces evidence that he or she cannot return to his or her past relevant work, "the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering" his or her age,

education, work experience, and limitations. *Hancock v. Astrue*, 667 F.3d 470, 472–73 (4th Cir. 2012) (internal quotation marks omitted).

## II. Procedural History

Barts originally applied for DIB on May 5, 2005, alleging disability beginning April 4, 2005. (*See* R. 318.) He said that he could not work anymore because of chronic obstructive pulmonary disease ("COPD"), asthma, seizures, and diabetes. (*See* R. 402.) On June 16, 2005, the Commissioner found Barts disabled by COPD alone because that impairment "result[ed] in a residual functional capacity [of] less than sedentary." (R. 226.) In mid-2010, the state agency conducted a routine continuing-disability review. (*See generally* R. 331–73.) After a consultative exam and hearing, state-agency reviewers determined that Barts's disability "ended" as of September 1, 2010. (*See* R. 261–63, 266–73, 358.) Barts promptly pursued his administrative appeals.

Barts appeared with counsel at an administrative hearing on June 20, 2011. (*See* R. 224.) He testified as to his respiratory symptoms and the limits those symptoms had on his ability to perform his past work and current daily activities. (*See generally* R. 239–51.) A Vocational Expert also testified as to the type of work Barts did before he became disabled. (*See* R. 252–57.) In a written decision dated July 14, 2011, the ALJ agreed that Barts's disability ended as of September 1, 2010. (R. 230.) He upheld the termination of benefits at Step Eight. (*See id*.)

The ALJ found that Barts's COPD, while still "severe," had medically improved by September 1, 2010, and that this improvement increased Barts's residual functional capacity ("RFC")[2] enough so that he could reenter the workforce. (*See* 226–30.) Specifically, the ALJ

---

[2] "RFC" is an applicant's ability to work "on a regular and continuing basis" despite his or her limitations. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 404.1545(a), and reflects the "total limiting effects" of the person's impairments, *id.* § 404.1545(e).

found that Barts could do a limited range of sedentary work if he avoided concentrated exposure to respiratory irritants and poor ventilation. (R. 227.)

When Barts asked the Appeals Council to review the ALJ's decision, he also submitted over 200 pages of additional medical records dated May 2005–January 2012. (*See* R. 1, 7–220.) The Appeals Council explained that it

> looked at the additional evidence you submitted from Duke Medicine dated October 17, 2011 through January 23, 2012 and from Danville Regional Medical Center dated August 9, 2011 through January 25, 2012. The Administrative Law Judge decided your case through December 31, 2009, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.

(R. 1.) The Appeals Council declined to review the ALJ's decision on March 29, 2013, and this appeal followed.

### III. Discussion

Barts argues that the Appeals Council misapplied 20 C.F.R. § 404.970(b) when it refused to consider three medical records dated after the ALJ's decision (Pl. Br. 5–8), and that the ALJ's decision should be reversed "based on" those records (Pl. Br. 9–10). Alternatively, he asks this Court to "remand [his] case back to the Commissioner for further administrative proceedings." (Pl. Br. 11.) The Commissioner responds that the "primary issue" for this Court to decide is whether substantial evidence supports the ALJ's decision that Barts's "condition improved as of September 1, 2010, to the extent that he could return to a limited range of sedentary work." (Def. Br. 2.) She also argues that the Appeals Council properly declined to consider Barts's medical records because they were not "reasonably related to the period adjudicated by the ALJ." (Def. Br. 8.)

*A.*     *The Benchmark Date*

Before turning to the to the parties' arguments, I must clear up some confusion about the significance of certain dates in the original record. On July 14, 2011, the ALJ decided that Barts's "disability ended as of September 1, 2010." (R. 224, 231.) But on March 29, 2013, the Appeals Council said that the ALJ "decided [Barts's] case through December 31, 2009, the date [he was] last insured for disability benefits." (R. 1.) The Commissioner now argues that the ALJ actually decided the case through July 14, 2011, and that the Appeals Council's reference to December 31, 2009, was a harmless "mistake." (Def. Br. 7 n.2.) Barts also urges the Court to use July 14, 2011, as the benchmark date because 20 C.F.R. § 404.970(b) requires the Appeals Council to consider any new and material evidence that relates to the period on or before the date of the ALJ's decision. (*See* Pl. Br. 9.)

I agree that the Appeals Council made a mistake. Nothing in the ALJ's decision suggests that he decided Barts's case though December 31, 2009. (*See generally* R. 225–31.) On the contrary, the ALJ found that Barts's disability ended as of September 1, 2010—several months after his last-insured date. Nor can I find a law, regulation, or ruling that suggests a person's entitlement to benefits necessarily ends on his last-insured date even if he is still disabled. *Contra* 20 C.F.R. § 404.316(b)(1)–(3).

In any event, the Appeals Council rejected Barts's request for review after "appl[ying] the laws, regulations, and rulings in effect as of the date [it] took [that] action," March 29, 2013. (R. 1.) Binding agency rulings in effect on March 29, 2013, instructed agency adjudicators, including the Appeals Council, to consider any relevant evidence of the beneficiary's condition "that relates to the period on or before the date of the ALJ's decision." Soc. Sec. R. 13-3p, 2013 WL 785484, at *1 (Feb. 21, 2013) (changing a policy that limited review in termination cases to

a beneficiary's condition "at the time of the initial cessation determination," and not through the date of the Commissioner's administratively "final" decision). Thus, I agree with the parties that the Appeals Council was required to consider any new and material evidence related to Barts's respiratory impairment on or before July 14, 2011.

B.    *The ALJ's Decision*

On June 16, 2005, the Commissioner found Barts disabled by COPD because that impairment "result[ed] in a residual functional capacity [of] less than sedentary." (R. 226.) The ALJ handling Barts's termination appeal in July 2011 was asked to decide whether there had "been any medical improvement" in Barts's COPD and, "if so, whether this medical improvement [was] related to [his] ability to work." 20 C.F.R. § 404.1597(a); *see also* 42 U.S.C. § 423(f)(1)(A). If it was, the ALJ also needed to determine whether Barts could return to his past work, or, if not, whether he could perform other work in the national economy. *See* 42 U.S.C. § 423(f)(1)(B); 20 C.F.R. § 404.1594(b)(3).

"Medical improvement" means "any decrease in the medical severity" of an "impairment(s) [that] was present at the time of the most recent favorable medical decision that [the person was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). ALJs determine "medical improvement" by comparing "prior and current medical evidence" that must show "changes (improvement) in the symptoms, signs, *or* laboratory findings associated" with the impairment(s) in question. 20 C.F.R. § 404.1594(c)(1) (emphasis added); *see also Latchum v. Astrue*, No. 4:07-cv-42, 2008 WL 3978081, at *3 (W.D. Va. Aug. 26, 2008) (Kiser, J.) (holding that the Commissioner need only produce "sufficient medical evidence" of improvement and that the ALJ need not base his decision on the same type of medical evidence that the person used to establish the previous disability). A medical improvement is "related" to the person's ability to

work "if there has been a decrease in the severity" of an impairment "and an increase in [the person's] functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3). The Commissioner bears the burden of "show[ing] that a medical improvement has occurred and that the improvement relates to the claimant's ability to work." *Edwards*, 2012 WL 6082898, at *3.

### 1.    Medical Improvement

The ALJ in this case examined Barts's condition after June 16, 2005, the date of the "most recent favorable medical decision finding that" Barts was disabled by COPD. (R. 225.) He also focused almost exclusively on Barts's COPD because he found that the available "medical evidence establish[ed] that [Barts] did not develop any additional impairments" between June 16, 2005, and September 1, 2010.[3] (R. 226.) The ALJ concluded that the medical evidence in Barts's record "supports a finding that, as of September 1, 2010, there had been a decrease in medical severity" of the COPD. (*Id.*) In making that determination, the ALJ relied on Barts's hearing testimony and medical records dated September 2, 2010–March 9, 2011. (R. 226–28.)

### a.    Prior Medical Evidence of COPD

Barts was diagnosed with COPD in September 2004 after he was admitted to the hospital with chest pain and hypoxia. (R. 398.) During Barts's three-day hospitalization, Dr. Sydney Harris, M.D., noted persistent hypoxemia despite medical intervention and "subjective

---

[3] This approach comports with the statute, which dictates that a person will lose his entitlement to benefits if "the physical or mental *impairment on the basis of which such benefits are provided* has ceased." 42 U.S.C. § 423(f) (emphasis added); *see also* 20 C.F.R. § 404.1597(b) (stating that a person's "benefits will stop" if the agency determines "that the physical or mental impairment on the basis of which benefits were payable has ceased"). Although the agency can continue benefits "if a new severe impairment(s) begins in or before the month in which [the] last impairment(s) ends," the claimant must establish that the new impairment(s) is "severe enough" to render him "still disabled under § 404.1594." 20 C.F.R. § 404.1598; *see also* Soc. Sec. R. 13-3p, 2013 WL 785484, at *4–5 (clarifying that the policy requiring agency adjudicators to consider evidence of a beneficiary's condition through the date of the ALJ's decision eliminates the need for the person to file a new claim for benefits in Title II cases).

improvement." (R. 394.) Barts was later discharged home on supplemental oxygen and medications including Singulair, Advair, and an albuterol inhaler. (R. 398.)

In April 2005, Barts managed his COPD with supplemental oxygen, Xopenex three times daily via a nebulizer, Spiriva once daily, Advair twice daily, and an albuterol inhaler as needed. (R. 399.) In early May 2005, Barts told Dr. Harris that he was "still very SOB [short of breath]" despite being "on oxygen 24/7." (R. 399.) On exam, Barts's lungs were "[d]iminished but clear without focal wheezes, rales, or rhonchi." (*Id.*) Dr. Harris noted that he would "keep [Barts] out of work 2 more months"; he also opined that Barts "may need to explore long term disability." (*Id.*) On May 16, 2005, Dr. Sinan Simsir, M.D., opined that Barts was in "significant acute respiratory failure" and that he "could be a good lung transplantation candidate." (R. 392.)

In his original benefits application, Barts reported that he was on oxygen 24-hours a day, felt fatigued, and had trouble breathing. (R. 402.) He also said that these symptoms significantly limited his ability to sit, stand, walk, lift, and carry objects. (*Id.*) State-agency physician Dr. Robert Chaplin, M.D., found Barts's statements to be "fully credible" on June 16, 2005.[4] (*Id.*) He noted in particular that Barts required continuous oxygen and was "being considered as a lung transplant candidate." (*Id.*)

### b. Current Medical Evidence of COPD

Barts saw Dr. Harris again on September 11, 2009. He said that he was "feeling pretty well," and he did "not report exertional chest pain." (R. 422.) Barts also said that he had had a "hectic summertime schedule" with his daughters' sports and that he "handled the heat . . . just

---

[4] An unsigned, undated assessment from the Richmond DDS office of Barts's "current" RFC contains the following restrictions: (1) occasionally lift or carry 10 pounds; (2) frequently lift or carry fewer than 10 pounds; (3) stand or walk fewer than two hours in an eight-hour workday; (4) sit with normal breaks for fewer than six hours in an eight-hour workday; (5) occasionally climb ramps and stairs; (6) never climb ladders, ropes, or scaffolds; (7) avoid "all exposure" to extreme temperatures, hazards, irritants, and poor ventilation. (R. 408–12.)

fine" despite his "moderately severe COPD." (*Id.*) On exam, Dr. Harris observed "diminished but clear" breath sounds. (*Id.*)

Barts returned to Dr. Harris's office on October 26, 2009, complaining of a persistent sore throat and cough. (R. 420.) He specifically denied chest pain and shortness of breath. (*Id.*) On exam, Dr. Harris noted 96% oxygen saturation and "lungs with coarse breath sounds." (*Id.*) Barts's current medications included an albuterol nebulizer, an albuterol inhaler, and an ipratropium bromide nebulizer. (R. 420–21.)

On January 13, 2010, Dr. Harris saw Barts for diabetes and lower-back pain. (R. 419.) Barts said that he was "doing reasonably well" and that his dyspnea was "stable" at that time. (*Id.*) Dr. Harris's treatment notes also state that Barts's "COPD [was a] disabling condition," but it is not clear whether that reflects Dr. Harris's opinion or simply restates Barts's contemporaneous report that "he is disabled by COPD." (*Id.*)

On January 20, 2010, Dr. Tessie Otero-Truitt, M.D., evaluated Barts for diabetes. (R. 404.) Barts reported "[n]o recent" shortness of breath, cough, wheezing, and "no" chest pain or shortness of breath on exertion or when he lies down. (R. 404.) On exam, Dr. Otero-Truitt observed "normal respiratory effort" and lungs that were "[c]lear to auscultation and percussion." (R. 405.) She also observed that Barts was a "healthy appearing individual in no distress." (*Id.*)

Barts returned to Dr. Harris's office on June 24, 2010, to discuss his continued need for (and noncompliance with) a prescription seizure medication. (*See* R. 418.) On exam, Dr. Harris observed that Barts's lung function was "[d]iminished consistent [with] known obstructive lung disease." (*Id.*) Barts apparently did not report any respiratory symptoms at this visit. (*See id.*)

Barts underwent a consultative pulmonary disability study on September 2, 2010. (R. 431–34; *see also* R. 427, 429–30.) A "computerized interpretation" of the results showed the following:

a moderate obstructive lung defect. The airway obstruction is confirmed by the decrease in flow rate at peak flow and flow at 50% and 75% of the flow volume curve. FVC changed by 9%. FEV1 changed by 8%. This is interpreted as an insignificant response to bronchodilator.

| FVC | Liters | 5.07 (ref) | 3.61 (pre meas) | 3.94 (post meas) | 9% (post chng) |
| FEV1 | Liters | 3.84 (ref) | 2.13 (pre meas) | 2.29 (post meas) | 8% (post chng) |

(R. 431.)

Barts returned to Dr. Harris's office on January 12, 2011, complaining of persistent sinus and chest congestion. (R. 465.) He specifically denied chest pain and shortness of breath. (*See id.*) Barts's current medications included an albuterol nebulizer, an albuterol inhaler, and an ipratropium bromide nebulizer. (*See* R. 465–66.) However, he also reported that "his nebulizer machine [was] very old/no longer working." (R. 465.) On exam, the nurse practitioner noted "coarse breath sounds bilaterally [but] no rales or wheezing." (*Id.*) Barts's oxygen saturation was 97%. (*See id.*) The nurse also noted that Dr. Harris reviewed a chest x-ray that showed pneumonia in the lower left lobe and "chronic changes c/w [consistent with] COPD/emphysema." (*Id.*)

Barts had "improve[d] breath sounds" after one in-office Duoneb treatment. (R. 466.) The nurse prescribed cough medication and a prednisone taper. (*Id.*) Barts also was prescribed a new nebulizer machine with instructions to use albuterol and Atrovent three or four times each day. (*Id.*) Dr. Harris's office instructed Barts to report worsening symptoms or failure to improve and to follow up in one week. (*See id.*)

Barts returned for his follow-up appointment on January 19, 2011. He reported "feeling better" after using the nebulizer as directed, but he also reported waking up several times each night with shortness of breath even on supplemental oxygen. (R. 462.) On exam, Dr. Harris noted "[p]ulse oximetry 96% room air/resting" and "lungs [with] scattered rhonchi [but] no rales or wheezing." (*Id.*) Dr. Harris also ordered an overnight oximetry study to evaluate Barts's nighttime oxygen saturation. (R. 464.)

Barts's final visit to Dr. Harris before the administrative hearing was on March 9, 2011. (R. 460.) According to Dr. Harris's treatment notes, Barts "d[id] not have any cough, congestion, shortness of breath, or wheeze that [was] any worse than usual" on that date. (*Id.*) He requested and received a refill for his ProAir inhaler. (*Id.*) Dr. Harris also observed:

> [s]everal years ago [Barts's] lung health was much worse than now. He was actually on oxygen continuously for an extended period of time, [and] was able to come off during the day, then on my order had overnight oxymetry [*sic*] test which showed no desaturation so oxygen was taken out of the home. I am not certain he was real thrilled about that. Today he is asking how he can have good oxygen [saturation] at night while sleeping and still wake up short of breath and need . . . ProAir.

(R. 460.) Dr. Harris explained that "aspiration of reflux while recumbent" might cause Barts to feel short of breath even if his oxygen saturation remained stable. (*Id.*) Still, Dr. Harris opined that the "overnight oxymetry [*sic*] should be repeated to verify that the 1st result (*i.e.*, no desaturation) [was] really accurate" if Barts "continue[d] to need ProAir in the middle of the night." (*Id.*) Dr. Harris wrote that Barts would "let [him] know if he believe[d] this is necessary." (*Id.*)

On exam, Dr. Harris noted that Barts appeared "barrel-chested consistent with some obstructive lung disease," but that he "hear[d] no wheeze, crackles, or rales" in the lungs. (*Id.*)

Barts's oxygen saturation was 97% on room air. (*Id.*) Dr. Harris also reported that a current chest x-ray revealed that the "previously seen left lower lobe pneumonia ha[d] resolved." (*Id.*)

At the administrative hearing on June 20, 2011, Barts testified that his breathing was "fair" and "a little bit better" compared to 2005. (R. 239.) When asked to explain his improvement, Barts said that he was no longer "dependent on oxygen during the day." (R. 240.) But he also said that he still slept with supplemental oxygen and kept a ProAir inhaler with him at all times. (*See* R. 239.) Barts used the inhaler "as needed" depending on the temperature and "what kind of stuff [he was] doing." (*Id.*) On a typical day, Barts said that he tried to keep up his yard or do a little housework. That was a change from 2005, when he could do "very little" around the house. (R. 240.) Barts also said that he could now work for "maybe 45 minutes to one hour" before needing to take a 30 minute break. (*Id.*) After that, he could go back to work for another 45 or 60 minutes. (*Id.*) Barts testified that he did not have much trouble walking as long as he kept his inhaler with him. (R. 242.)

### c. Analysis

The ALJ concluded that the "medical evidence supports a finding that, as of September 1, 2010, there had been a decrease in [the] medical severity" of Barts's COPD. (R. 226.) First, he noted that Bart's "respiratory problem did not meet or equal the requirements of any section of Listing 3.00." (R. 226 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 3.00).) He cited the September 2, 2010, pulmonary disability study which revealed that Barts's "FEV1 level was 2.29 and his FCV was 3.94."[5] (*Id.*) Summarizing medical records from January and March 2011, the ALJ

---

[5] These forced vital capacity ("FVC") and one-second forced expiratory volume ("FEV1") values appear to be too high to meet the listed criteria for COPD or chronic restrictive ventilatory disease. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 3.02A, tbls. I–II (noting that FVC must be "equal to or less than" 1.75 and FEV1 must be "equal to or less than" 1.55 when the person stands 70–71" tall without shoes). However, the September 2010 spirometry results are of limited use for measuring "medical improvement" because the ALJ did not have Barts's spirometry results from August 2005. Barts included the August 2005 results

13

noted that Barts's oxygen-saturation levels were consistently 96% or 97% on room air. (*See* R. 226–27.) His lung sounds, although "diminished" and occasionally "coarse," were also consistently without wheezing, rales, or rhonchi. (*Id.*)

The ALJ also cited Barts's testimony that he "no longer require[d] oxygen 24 hours per day" and that his COPD symptoms "ha[d] improved since 2005." (*Id.*) He cited Dr. Harris's treatment notes from January and March 2011, in which Barts denied chest pain and dyspnea and reported "feeling better" after regular nebulizer treatments. (R. 226–27.) But the ALJ also acknowledged instances where Barts reported that his COPD symptoms were "no worse than usual" and complained of nighttime dyspnea after Dr. Harris completely discontinued supplemental oxygen. (*Id.*) Citing Dr. Harris's March 2011 treatment notes, the ALJ later expressed skepticism that Barts was back on nighttime oxygen by June 2011. (*See* R. 228.)

Substantial evidence in the original record supports the ALJ's finding that there had been "any decrease in the medical severity" of Barts's COPD between June 2005 and September 2010. 20 C.F.R. § 404.1594(b)(1). The Commissioner needed to produce "sufficient medical evidence" showing that this once-disabling impairment's symptoms, signs, or laboratory findings had "improved." *Latchum*, 2008 WL 3978081, at *3. Barts's testimony and statements to healthcare providers clearly "demonstrate[] an improvement" in his COPD symptoms. *Id.* (*Compare* R. 399, 409 *with* R. 239–240, 280, 404, 418, 419, 420, 422, 465.) Medical records from treating and examining sources also document "improved" signs of COPD after June 2005. (*Compare* R. 394, 399 *with* R. 404, 460.) Dr. Harris's decision to discontinue supplemental oxygen during the day is itself compelling evidence of improved respiratory function. (R. 460.)

---

with his request for Appeals Council review. (*See* R. 209.) They reveal FVC of 3.71 and FEV1 of 1.64, which only reinforces the ALJ's finding that Barts's COPD had "improved" between June 2005 and September 2010. (*Compare* R. 209, 212 *with* R. 431.)

The fact that Barts still exhibited signs and symptoms consistent with COPD does not undermine the ALJ's finding that there was "any decrease" in that impairment's medical severity. (*See, e.g.*, R. 422, 460, 462, 465.) "[I]t is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein." *Wireman v. Barnhart*, 2:05-cv-46, 2006 WL 2565245 at *8 (W.D. Va. Sept. 5, 2006) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)). I must defer to the ALJ's factual findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401. I find that requirement was met here. *See Latchum*, 2008 WL 3978081, at *3. Furthermore, Barts does not object to the ALJ's finding of medical improvement to the extent that it is based on evidence in the record at the time of the administrative hearing. (*See* Pl. Br. 9–10.) Rather, he urges the Court to reverse the ALJ's decision "based on" three additional medical records that the Appeals Council did not consider. (Pl. Br. 9, 11.)

B.    *Evidence Submitted to the Appeals Council*

When a claimant appeals an ALJ's ruling, the Appeals Council first makes a procedural decision whether to grant or deny review. *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005). In deciding whether to grant or deny review, the Appeals Council must consider any additional evidence that is new, material, and related to the period on or before the date of the ALJ's decision.[6] *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 95 (4th Cir.

---

[6] The Appeals Council's treatment of the additional evidence in Barts's case creates an awkward procedural posture for this Court's review. The Appeals Council "looked at," but did not indicate that it had considered, his additional evidence because it found that "th[e] information [was] about a later time." (R. 1.) Under those circumstances, the regulations direct the Appeals Council to return the evidence to the claimant "with an explanation as to why it did not accept the additional evidence." 20 C.F.R. § 404.976(b)(1). In Barts's case, the Appeals Council incorporated the evidence into the record filed with this Court rather than returning it to Barts unexamined. (*See* R. 1–2, 7–220.)

1991) (en banc) (citing 20 C.F.R. § 404.970(b)); *see also* Soc. Sec. R. 13-3p, 2013 WL 785484, at *1. "Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a reasonable possibility that the new evidence would have changed the outcome.'" *Davis*, 392 F. Supp. 2d at 750 (quoting *Wilkins*, 953 F.2d at 95–96).

The Court may not attempt to weigh the new evidence or to resolve conflicts with existing evidence. *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013) (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). Instead, it must determine whether the evidence was "material"—in other words, whether the evidence had "a reasonable possibility of changing the

---

When a claimant presents additional evidence that the Appeals Council did not "consider" in accordance with 20 C.F.R. § 404.970(b), courts in this district review such evidence to determine whether it requires remand under sentence six of 42 U.S.C. § 405(g). *See, e.g.*, *Wilson v. Colvin*, No. 7:13-cv-113, 2014 WL 2040108 at *3–4 (W.D. Va. May 16, 2014) (Conrad, C.J.); *Reamey v. Astrue*, No. 6:08-cv-21, 2009 WL 1619211 at *4–5 (W.D. Va. Jun. 8, 2009) (Urbanski, M.J.); *see also Wooding v. Comm'r of Soc. Sec.*, No. 4:10-cv-6, 2010 WL 4261268, at *2–3 (W.D. Va. Oct. 29, 2010) (Kiser, J.). Typically in sentence-six cases, the plaintiff submits the additional evidence to this Court because the Appeals Council returned it to him unexamined. *See, e.g.*, *Wilson*, 2014 WL 2040108, at *3 (Appeals Council returned evidence to the applicant); *Reamey*, 2009 WL 1619211, at *3 n.2 (Appeals Council returned evidence to the applicant because it was "about a later time"). "A sentence-six remand includes no ruling as to the correctness of the administrative determination." *Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991)) (Kiser, J.). A court's authority under sentence six is limited to remanding the case for "'additional evidence to be taken.'" *Wooding*, 2010 WL 4261268, at *2 (quoting 42 U.S.C. § 405(g)).

Where the Appeals Council incorporates additional evidence into the record, it usually also reviews the substance of the evidence to determine whether it provided a basis for changing the ALJ's decision. In Barts's case, the Appeals Council did not consider the substance of the additional evidence, but it nonetheless incorporated the additional evidence into the record. Fourth Circuit precedent requires courts to review the entire record, including the new evidence, to determine whether the Commissioner's decision is supported by substantial evidence. *See Wilkins*, 953 F.2d at 96; *Wooding*, 2010 WL 4261268, at *6. For such a review, the court's authority falls under sentence four of 42 U.S.C. § 405(g), which is broader than its authority under sentence six. Under sentence four, the court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

However, because I find that the additional evidence submitted by Barts to the Appeals Council is not material, a standard applicable under both sentence four and sentence six, *compare Wilkins*, 953 F.2d at 96 (sentence-four factors), *with Doll-Carpenter v. Comm'r* , 4:11-cv-28, 2012 WL 5464956, at *4 (W.D. Va. May 7, 2012) (Kiser, J.) (sentence-six factors), I need not further address which sentence would apply had I determined that remand was appropriate.

outcome of the case." *Id.* If the new evidence "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports," then it is conceivable that the ALJ would have reached a different result upon considering it, and the court must reverse. *Id.*

### 1. *Post-Dated Medical Records*

Barts cites three medical records that he believes the Appeals Council was required to consider under 20 C.F.R. § 404.970(b) as new, material, and related to the period on or before the date of ALJ's decision. (*See* Pl. Br. 6.)

The first medical record is from Dr. Victor Tapson, M.D., at Duke University Medical Center's Division of Pulmonary and Critical Care Medicine. (Pl. Br. 6–7 (citing (R. 187–90).) Dr. Tapson saw Barts for a pulmonary new-patient evaluation on November 7, 2011. (R. 189.) At the time, Barts's medications included Symbicort two puffs twice daily, nebulized albuterol/atrovent as needed, ProAir two puffs every four hours as needed, and oxygen 2L per minute at night. (R. 189.) Dr. Tapson's treatment notes include a longitudinal review of Barts's long-standing respiratory problems. For example, Dr. Tapson notes that in 2005 Barts

> described several episodes in the previous five years where he had acute onset dyspnea and profound hypoxemia prompting hospitalization. His symptoms of hypoxemia had improved over weeks to several months. Between the episodes he returned to full functioning. . . . [H]e is overall better than he was in 2005 but he still gets dypneic with moderate exertion. Things like pushing a dresser, walking up stairs, extreme heat or cold cause dyspnea. His dyspnea is almost always accompanied by wheezing.

(*Id.*) Barts stated that his ability to breathe was unchanged over the past year. (*Id.*) On exam, Dr. Tapson observed that Barts's lungs were "clear but with diffusely decreased breath sounds." (R. 190.) Contemporaneous pulmonary testing revealed "severe airway obstruction" and "prominent

obstructive airways disease." (R. 187, 182). Barts gave good efforts and recorded a FEV1 score

of 1.89. (R. 187.) After an exam, Dr. Tapson opined that Barts's

> symptoms are quite intermittent and sound more like asthma[,] although his
> clinical exam is more consistent with emphysema. He clearly has obstructive
> airway disease. His oxygen saturation is completely normal and its sounds like he
> is mainly disabled based upon intermittent symptoms. He is certainly not disabled
> based upon his baseline pulmonary function testing, walk distance, or oxygen
> saturation.

(R. 190.) Dr. Tapson recommended a CT scan to "really get a sense of how bad [Barts's] lung

disease is." (*Id.*) Although he did not "expect[] to see significant interstitial lung disease," Dr.

Tapson surmised that Barts's emphysema might be "disproportionately severe compared to

pulmonary function testing." (*Id.*) Dr. Tapson also opined that Barts may feel much better after

he underwent pulmonary rehabilitation. (*Id.*)

The Commissioner, citing agency guidelines, argues that the records from Dr. Tapson are

"not reasonably related to the period adjudicated by the ALJ" because it does not "make[] a

direct reference to" that period. (Def. Br. 9.) This Court has consistently rejected such a narrow

reading of 20 C.F.R. § 404.970(b). *See, e.g.*, *Wilson*, 2014 WL 2040108 at *4; *Reamey*, 2009

WL 1619211 at *4. Post-dated evidence "relates to" the period on or before the date of the ALJ's

decision if it addresses the claimant's symptoms or condition at that time. *See Wilson*, 2012 WL

2040108, at *4 (noting that post-dated "evidence relate[d] to physical problems, and related

subjective symptomology, which were addressed by the [ALJ] in his opinion"); *Reamey*, 2009

WL 1619211 at *4 (noting that post-dated surgical records "clearly relate to [the applicant's]

back condition" during the relevant period because he "had complained of low back pain . . .

since 2004"); *see also Jackson v. Astrue*, 467 Fed. App'x 214, 218 (4th Cir. 2012) (noting that

post-dated records "reinforced the credibility of Jackson's testimony").

I agree that the November 7, 2011, medical record relates to Barts's respiratory "problems and related subjective symptomology" that the ALJ specifically addressed in his opinion. *Wilson*, 2012 WL 2040108, at *4. Dr. Tapson's evaluation involved a longitudinal review of Barts's breathing condition from 2005 to November 2011. Accordingly, his assessment related to the period on or before the ALJ's decision in July 2011.

Dr. Tapson's opinion and findings are largely consistent with other medical evidence in the record. He found that Barts had obstructive airway disease and noted his improved condition since 2005. Based on diagnostic testing conducted the same day as the assessment, Dr. Tapson determined that Barts's oxygen saturation was normal, his "six-minute walk distance was quite good," and his baseline pulmonary functioning was not at a level that would suggest disability. (R. 190.) Barts confirmed that his breathing condition had not changed in the past year. Based on Barts's report, Dr. Tapson noted that Barts experienced dyspnea with moderate exertion and exposure to extreme heat or cold. (R. 188.) He also noted Barts's report of "awaking two to three times per night gasping and needing to use inhalers." (R. 189.) However, beyond these reports, Dr. Tapson did not note that Barts experienced any reoccurrence of breathing complications since 2005.

Dr. Tapson's findings and opinions are not inconsistent with the ALJ's decision. In assessing Barts's RFC, the ALJ determined that Barts had a severe breathing impairment and could do a limited range of sedentary work if he avoided concentrated exposure to respiratory irritants and poor ventilation.

The most significant discrepancy between Dr. Tapson's findings and the other evidence in the record concerns his opinion that Barts "is mainly disabled based on intermittent symptoms." Dr. Tapson's statement that Barts is "disabled" is not entitled to any deference, *see*

20 C.F.R. § 404.1527(d)(1), but his explanation that Barts's breathing condition manifests with intermittent symptoms could indicate that his medical improvement will not last.

A condition that is subject to "temporary remission" "will not warrant a finding of medical improvement" if a longitudinal examination indicates the impairment's "prospects for future worsenings." 20 C.F.R. § 404.1594(c)(3)(iv). Breathing conditions, such as asthma, are subject to temporary remission. *Cf. Neimasz v. Barnhart*, 155 Fed. App'x 836, 840 (6th Cir. 2005) (finding that back injuries, unlike multiple sclerosis, rheumatoid arthritis, many mental impairments, epilepsy, and asthma, generally are not subject to temporary remission (citing Soc. Sec. Admin., Program Operations Manual System § DI 28010.115(B)(2), *available at*, http://secure.ssa.gov/apps10/poms.nsf/lnx/0428010115)). Where courts have found temporary remission of a condition undermined a finding of medical improvement, the claimants still experienced significant impairment due to their conditions that limited their functional ability. *See, e.g.*, *Czerska v. Colvin*, No. TMD 12-2238, 2013 WL 5335406, at *4–5 (D. Md. Sept. 20, 2013); *Carlson v. Shalala*, 841 F. Supp. 1031, 1037–38 (D. Nev. 1993). Conversely, the evidence of Barts's conditions and functional abilities show notable improvement sustained over at least one year.

Without resolving whether intermittent symptomology explains Barts's medical improvement, I find that it does not materially undermine the ALJ's decision. Dr. Tapson and Barts, by his own account, reported that his breathing condition improved and that the improvement lasted for at least one year. *See* 20 C.F.R. § 404.1594(b)(1) (providing an example of medical improvement for a once-disabling rheumatoid arthritis condition that experienced decrease in severity of symptoms for one year). Dr. Tapson did not note any functional restrictions greater than those imposed in the ALJ's RFC determination. Accordingly, Dr.

Tapson's November 2011 report does not raise a reasonable possibility that the ALJ would reach a different decision as to Barts's medical and functional improvement.

Barts argues that Dr. Tapson's treatment record is material because the ALJ discredited Barts's testimony in June 2011 that he still used oxygen at night. (Pl. Br. 6.) The Commissioner argues that other treatment records from before and after November 2011 do not indicate that Barts was prescribed oxygen at night. (Def. Br. 9; *see* R. 132.) Dr. Tapson's notes do not provide the corroboration that Barts suggests, namely that he was using supplemental oxygen at night in June 2011. Instead, assuming the accuracy of the notes, they indicate the Barts used oxygen at night in November 2011, not five months earlier in June. Thus, the notes do not undermine the ALJ's doubts about Barts's testimony in June 2011. Moreover, the ALJ noted that despite Barts's complaints of difficulty breathing at night, he was still able to perform at least sedentary work during the day. (R. 228.) Given the ample evidence cited by the ALJ of Barts's medical and functional improvement, I find that this discrepancy in the evidence does not raise a reasonable possibility of changing the outcome of the case.

The second and third records concern Barts's alleged back pain. (*See* Pl. Br. 8–9 (citing R. 98, 110).) Dr. Harris referred Barts for imaging studies in January 2010 after he reported "lower back pain w[ith] walking." (R. 419.) It appears from the additional evidence that Barts did not undergo the first imaging study until August 2011 when he had "low back pain radiating to both legs." (R. 110; *see also* Pl. Br. 8.) Two views of the lumbar spine revealed:

> preservation of the vertebral body heights and disc spaces. Grade I anterolisthesis of L5 over S1 demonstrated. Bilateral pars defects are suspected. Rest of the lumbar vertebrae normal alignment. Impression: Grade I L5-S1 spodylolisthesis.

(R. 110.) A second imaging study conducted in January 2012 was "normal" except for "mild degenerative changes in the thoracic spine." (R. 98.)

Barts argues that the Appeals Council was required to consider these two records because they are new, material, and related to the period on or before the date of the ALJ's decision. (Pl. Br. 8–9.) The results of these imaging studies are "new" because there is no objective medical evidence in the original record to corroborate Barts's alleged back pain. They are also "related to" Barts's condition before July 14, 2011, to the extent that he complained of back pain in January 2010. *See Wilson*, 2014 WL 2040108 at *4; *Reamey*, 2009 WL 1619211 at *4.

But these records are certainly not material. First, Barts has never claimed to be physically limited—let alone disabled—by back pain. At a hearing before a disability officer in December 2010, Barts did not complain of back pain or attribute any functional limitation to a back problem. (R. 274–85.) Barts also testified in June 2011, that he would not have any trouble walking as long as he kept his inhaler nearby. (R. 248.) That was just over one month before he underwent an imaging study for "low back pain radiating to both legs." (R. 110.) Even Barts admits that these results present the "*first* indication that [he] had *possible* imitations connected to his back." (Pl. Br. 9 (emphasis added).)

Second, these records do not provide any evidence of functional limitations. (*See* R. 98, 110.) The January 2012 study was "normal" even though it revealed "mild degenerative changes in the thoracic spine." (R. 98.) The August 2011 study revealed "suspected" pars defects bilaterally and Grade I L5-S1 spondylolisthesis. (R. 110.) A diagnosis alone cannot establish disability, 20 C.F.R. § 404.1525(d), and Barts does not cite any evidence suggesting that these mild degenerative changes interfere with his ability to perform sedentary work. (*See* Pl. Br. 9.) Thus, there is not "a reasonable probability" that the August 2011 and January 2012 imaging studies would have changed the outcome in Barts's case. *Wilkins*, 953 F.2d at 95.

## IV. Conclusion

The Appeals Council must consider any evidence that is new, material, and related to the period on or before the date of the ALJ's decision. *See Wilkins*, 953 F.2d at 95; 20 C.F.R. § 404.970(b). The three medical records that Barts cites in his brief, however, do not satisfy each of these criteria. Because I find that the Commissioner's decision is supported by substantial evidence, I recommend that the Court **DENY** Barts's Motion for Summary Judgment or for Remand (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 16), **AFFIRM** the Commissioner's final decision terminating Barts's benefits, and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER:   July 3, 2014

Joel C. Hoppe
United States Magistrate Judge